Benefit Exchange Authority, et al. Mr. Clement for the appellant, Ms. Alecant for the appellate. Good morning, Your Honors, and may it please the Court. Paul Clement for the appellant. I'm going to endeavor to save three minutes for rebuttal. This case involves a case involving a constitutional and statutory challenge to what amounts to a user fee on non-users. By way of very brief background, the health care exchanges, whether established by the federal government or the state governments, have proven costly to operate. Typically, the exchanges are funded primarily through user fees on participating issuers. The district and the district alone, however, has taken a different approach. So just by way of an example, there's a user fee on participating issuers that amounts to 3.5 percent of the premiums for the policies that are issued on the new exchanges. In the district, the rate is 1 percent, and the way they've gotten that far lower rate is to impose the user fee or the assessment not just on the participating issuers, but on clients, on my clients, who provide accepted benefits plans that are expressly precluded from being offered on the exchanges. Now, this is certainly a convenient arrangement for the participating issuers who get their user fee reduced by roughly 70 percent, but we would submit it's inconsistent with the statute and with the Constitution. Now, before I turn to the merits, I guess I'd like to say just a moment on the jurisdictional issue here. Good idea. To be very clear about this, this is not just a situation where the district failed to raise this argument in the lower courts. When they were asked point blank by the district court judge, is this a tax, they replied, no, it's not a tax. Right, but you agree we still have to deal with it, correct? Well, I'm not sure I agree. It's jurisdictional and it doesn't make any difference. I think the question whether it's jurisdictional, Judge Tatel, is actually a difficult question. I'm happy to engage on the extent to which it's jurisdictional. I think the better view is that it's not and that it's ultimately waivable, but rather than spend a lot of time talking to you about that, I think I'd rather start at least by telling you why I think it's rather straightforward that the district had it right the first time. This is, in fact, a tax. And I think we all agree that the applicable test here is the three-factor test that I think... I think you misspoke. You said this is, in fact, a tax, but I think you meant... Yes, I'm sorry. I meant the opposite of what I said. I apologize, but this is, in fact, a regulatory fee, not a tax. And the test to determine the difference between the two, I think all the parties agree is a test that has its origins in an opinion written by then Judge Breyer for the First Circuit called San Juan Cellular Telephone. And you look to three things, and I think all three factors here are either neutral or point strongly in favor of it being a regulatory fee. I think the one that's maybe a bit neutral is whether or not this was imposed by the agency or by the legislature. And I think here what you have is a hybrid. You have a tax that originated with the authority and with a working group that included participating issuers and not my clients. But at a certain point they realized they needed the blessing of the legislature, and they got the blessing of the legislature to authorize the authority then to determine the amounts of the assessments. So I think the first factor... Didn't the authority, the statute, the statute provides that the tax, well, whatever it is, this charge... The assessment they call it. Let's call it a charge. Just keep it neutral for a moment. Whatever it is, that it has to be sufficient to pay for the cost of the exchange, but no more. So the legislature really not only authorized the tax, but just determined its amount, didn't it? I mean, the only thing the authority does is calculate, right? They just presumably divide the costs of the exchange by the number of insurers, and that's the tax, isn't it? Well, Judge Tatel, I mean, whether that's all they can do, whether it's that ministerial or not, I think... Well, but read the statute. The statute says, the amount assessed shall not exceed the reasonable projection regarding the amount necessary to support the operations of the authority. Right, and I think ultimately that helps us when we get to the third factor of the test. I guess what I would say for purposes of the first factor, though, it is still the authority that is the one that's supposed to impose it. And so, I mean, for purposes of the non-delegation argument, that may be enough direction, but I think even what we have here is a situation where the tax originated with the authority, and then the legislature authorized them to impose it. And I think what that gets you on the first factor is maybe a wash. The second and third factors, I think... Wait, just go back a moment. Sure. Why should that factor be of any consequence? I know courts have said it is, but why should it be of any consequence, one way or the other? I think the way it should be of some consequence is I think there is a sort of sense that maybe the legislatures, broadly speaking, are the ones that should be imposing taxes and not agencies. So if it's a situation where the agency's done it, maybe it's more like a regulatory fee than it is like a tax. But I don't think that's a particularly dispositive factor, especially when, in a case like this, it's kind of a wash and points in two directions. I think the second and third factors are more important. The district concedes that the second factor supports the classification of the assessment as a regulatory fee, because this is not a broadly applicable assessment. It's an assessment just on participating issuers and my clients and a few others that have accepted benefits products. So in that sense, it's a very narrow universe, and that's something that points in the direction of it being a fee rather than a tax. Of course, Eastern Trans Waste says that's the least important of the factors. Well, which is fine and well, because the third factor, I think, which it said may be the most important, I think strongly points in our favor, which is the very provision you were reading, Judge Tatel, makes crystal clear that this isn't something that goes into the general treasury for general purposes. This is used exclusively for the authority to fund the exchanges that my clients are barred from participating in. It certainly is not a fee where the payors and the payees match up closely. Right. And a close matchup seems to me the best indicator of a fee. I would beg to differ, Judge Williams. I would say that the lack of a matchup is a bit of a problem on the merits, but for purposes of the jurisdictional... It's a problem for the district. Yes, for the district on the merits. But I don't think it's a problem for us on the jurisdictional question, because as to that, the question that the court asks is, is it broadly applicable or is it narrowly targeted? And to the extent there's a mismatch in the narrow targeting, I think that's a merits issue, but doesn't take it out of the third factor, which I think here strongly points in our favor. And I think that, in particular, the provision in the statute that says that the fee reverted to the general treasury is also an important aspect of this third factor. And indeed, if you go back to Judge Breyer's opinion in the San Juan Cellular Telephone Company case, that's really what ended up being dispositive in that case. You had a fee that was imposed by the telecommunications arm of Puerto Rico. There were some factors that pointed in different directions, but there was a specific provision in the law there that said that once the fees came to the communications agency of Puerto Rico, they couldn't be diverted to general revenues. And you have the same thing here. Before I leave the jurisdictional issue, though, you have one other thing here. Wait, wait, wait. I just wanted to ask you about that factor. How do you distinguish this case from what happened from the facts of the assessment in the Eastern Waste case itself? There, the tax was imposed just on solid waste operators. That's all. Right? That's my understanding, yes. So isn't that just like this case? Well, and in fact, the court, as I read the opinion there, didn't decide this issue. It thought it was sufficiently close that it didn't decide the issue and went on to the merits, which doesn't strike me as the exemplar of how to deal with steel company issues, but in all events, that's what they did in that case. So it's not like that's a case where it was found that there was not jurisdiction. And I think that what I would say here is there is in this case, though, I think something of a tiebreaker, if you will, if you think it's close, and I don't think it's particularly close. And that's the other provision of D.C. law, which is D.C. Code 47-2608A1, which basically, in the context of imposing a 2 percent tax on insurance carriers, says that that tax shall be in lieu of all other taxes, with the exception of real estate charges and certain fees and charges. And I think that provision probably explains both why the district made the concession below and why, if you have any doubt here, you should err on the side of treating this as a fee, not a tax. Nothing is more notorious than the fact that an assessment can be a tax for some purposes but not for others. Absolutely, Judge Williams, but let's go to the source. It was that what the court said in NFIB against Sebelius is that for purposes of the jurisdictional issue, there was the Anti-Injunction Act, you take the legislature at their word. And here the legislature used the word assessment, not tax. And unless you're going to read what they did as an implied repeal of the provision that I just referenced about no more taxes, then I think you have multiple reasons to take the legislature at their word and say this is an assessment that doesn't amount to a tax. By the way, the reason that provision is in the code, it's not just there as a matter of happenstance. There are comparable provisions in the codes of other states because if you impose taxes on top of that, you get into the possibility of retaliatory taxes by other jurisdictions on insurers. And so it's a very important provision. Mr. Clement, can you just tell us a little bit more about that, get into the risk of retaliatory taxes? I noticed that, but I didn't understand exactly how that works and how that risk arises and why that's a reason to construe this particular provision in any one way or another. I think the issue here is, you know, you go back to McCarran-Ferguson, you have a lot of state regulation of insurers, but they typically regulate out-of-state insurers based on their operations in the state. And so there's a real potential for one state to impose a tax on, say, the premiums written, another state to impose tax on income, and you get into all sorts of potential problems and nasty dormant commerce clause issues. And I think the states have essentially reached essentially an agreement where they impose limited taxes on premiums. And if the state were to go above that and start imposing additional taxes, I think it does create this risk that other states would retaliate and you would have, whether it's a race to a bottom or not, you'd have a real problem with retaliatory taxes. And so that explains why the provision's in the code. It explains why I think the district... But that's assuming that... I'm still being a little bit unclear about how that operates. The insurers that operate in D.C., your clients, are not D.C. insurers. How do you retaliate against... I mean, they're not D.C. identified. So to punish those insurers by raising taxes in Kansas or California or New Mexico, it just harms the industry. It doesn't harm D.C. How do you retaliate against D.C.? Other states might retaliate against D.C.-based insurers and vice versa, because what you have is you have insurers that are licensed to do business here, their home state may be somewhere else. And so I think the way that... D.C. takes 2% of the premiums right here. And if this is, then it's going to take a bigger percent. But I'm just trying to understand the mechanics of how that retaliation could even take place. First of all, most of your clients are not D.C.-based. Are any of them D.C.-based insurers? I don't know that they are, but I think there are D.C.-based insurers that could be subject to the retaliation in other jurisdictions. And how could you, consistent with the Domain Commerce Clause and or Equal Protection, target those insurers as opposed to insurance generally? I just know that you're responding to this. In an effort to reach those insurers, you might target a broader group of insurers to try to... Right, right. But it's going to lead to essentially a kind of, you know, a race to whether you call it the bottom or the top. I suppose it depends on whether you're getting the revenue. But I think it's something that the states consciously want to avoid. They've kind of reached an accommodation on this, and that's why you have that provision that basically says, look, there's a 2% tax on premiums. It's in lieu of additional tax. They carve out real estate taxes. They carve out certain other fees and charges. I just think putting an additional tax on that is something that could, you know, I don't have a crystal ball. I don't know that it would lead to retaliation, but I think that's a real concern, and I think that's why the provision's on the books. But I don't know that anything turns on why it's on the books. I think that the more salient point is that, you know, the district almost invites you to read the new D.C. Code provision as an implied repeal of that. Let me ask you just about the solid waste situation. So as I understand it, certain of the dumps hazardous, and they needed, the jurisdiction needs some money to make sure that they're cleaned up. But not all of the dumps are being sloppy and hazardous. But all of the, there is a tax imposed on or a fee imposed on all of the waste collectors and depositors. And in your view, I mean, that has, like this case, a circumstance of some of the folks who aren't responsible for and or benefiting from the use to which the fund is being targeted having to pay it. And that, in your view, doesn't render that a tax either. That would be a fee. Well, again, I think that, you know, that question sort of straddles the merits and the jurisdictional issue a little bit. And, you know, I think we're harmed by the fact that the solid waste case didn't have a jurisdictional holding. And so I guess what I would say is on the jurisdictional point, I think this is a much stronger case for a variety of reasons, not the least of which is this additional code provision that I mentioned. On the merits, I think the cases are quite distinguishable because you, when you get into a situation where you are, you know, in a sense, there's a line drawing question about does everybody benefit equally. I think that those are the kind of questions where the courts typically defer to the legislature. But I think if you go to the court's cases on this, and I'm talking the Supreme Court's cases, and you start with Village of Norwood, and then you go through Mile Salt and Road Improvement District, but all the way up to Webb's Fabulous Pharmacy and the Sperry case, I think the teaching of those cases is that while we are willing to defer to the legislatures about the amount of the benefits and the like, we're not willing to defer to and approve legislative approaches that are effectively indifferent to whether somebody is benefiting in any material way. I mean, the test that emerges is whether the charge is a loose approximation for the benefits. And I think we win under that test. But I think if you want to look at it from even like 30,000 feet, I mean, you know, in Village of Norwood, what did the jurisdiction do? It said, we're going to impose the assessment without regard to the extent to which the benefit, the property benefits. And that's held impermissible. In Mile Salt, they imposed an assessment for a drainage district on literally the highest and driest property in the district, in the parish. And the court says, no, that's problematic. In the Rail District Improvement case, they impose a higher assessment on the railroad for a highway that's likely to divert business away from the railroad. And in Webb's Fabulous Pharmacy, what they do is they keep the interpleader interest. And the court even suggests, like, maybe if that was being done under the guise of a user fee, it would at least be a harder case. But the Florida courts imposed a different fee for using the court system. So that was kind of inexplicable. And I think you have a comparably clear case here where you have something that when the federal government imposes it, they call it a user fee. The district below even called this a user fee when it was applied to the participating issuers. But they applied the exact same fee in the exact same amount to companies that are categorically barred from using the exchange. Just a little question. Are the participating issuers not also ACLI members? No, they're not. Because, you know, the reality is the participating members are what you would think of as your classic health insurers. And the ACLI members are what you would think of as your classic life insurance companies. But they also provide things like long-term disability, like, you know, sort of long-term care insurance. And I think what Congress recognized in the ACA is, frankly, those things are more like life insurance and other things, which is why they were accepted from the ACA in a very deliberate way. And is it not the case that the proportion that your clients would have to pay has ebbed over time as more people are participating in the exchange? No. I actually think that gets to the heart of what's, I mean, particularly unfair about this arrangement. So, I mean, what the district faced by their own sort of decision about how they were going to structure their exchange is really a two-year gap. Because they got the exchange up and running before they closed the market for small businesses. So they effectively didn't force as many customers onto the exchanges in the first two years. And that created a funding gap. Right. But the solution that they came up with, imposing this user fee on my clients, is a permanent solution. And it actually is indifferent, precisely because they imposed it on people who are never going to participate on the exchange. How can that be, given the provision that Judge Tatel read about the district being prohibited to collect more than is needed? If the premium base of participating insurers grows as more people sign up, isn't that necessarily the case? No. Because they're not also drawing funding from that. No. Because here's the thing. They imposed, from the beginning, they imposed the fees on everybody, whether or not they participated in the exchange. So as they closed the exchange in later years and forced more people onto the exchange, it utterly is indifferent to the amount of the assessments on everybody. But, of course, my clients are still stuck because they can't possibly get on the exchange and get any benefits. And, you know, I'm not here to tell you that if they did this as just a two-year stopgap that we wouldn't be here. But I think part and parcel of the unfairness, and I think the unconstitutionality of this, is that it's a permanent solution. We're stuck paying 1% as a de facto user fee for something that we can't use in perpetuity. And, again, that's why, you know, it's interesting because in the first couple of years, when they had the stopgap problem, the charge they would have had to make on the participating users was higher than the federal rate. I think as both parties looked at the numbers, once they got everybody on the exchange, it would be about the same. But now the participating issuers are locked into a 1% rate, and so are we, even though we don't get the benefits of the exchanges. Okay. Thank you. Thank you, Your Honors. Okay. Good morning. It may please the Court. Lauren Ali-Conlon for the District of Columbia. The Establishment Act levies a tax on health care providers operating in the District, and the Superior Court in the District of Columbia is the exclusive venue for ACL members to bring a challenge to that tax. Mr. Clement and I agree on the test. We agree on the three-factor test. However, we vehemently disagree on the outcome of that test. Do you think this issue is jurisdictional for us, or is it waivable for us? Absolutely, it's jurisdictional, Your Honor, and that is because D.C. Code 11-1202 vests exclusive jurisdiction in the Superior Court for the District of Columbia, and that's notwithstanding any other provision of law. So in this case, it's not like the Tax Injunction Act, which is susceptible to a reading in which it might be non-jurisdictional. This is an exclusive jurisdiction provision that Congress put into the D.C. Code, which suggests that if this is a tax, or doesn't suggest, mandates that this is a tax, it must be challenged by ACLI's members in the Superior Court. Now, looking at the three-factor test, the first factor is what entity imposes the charge, and it's well established that when the legislature imposes the charge, it is a tax. When the agency levies the fee, then it's a fee and it's not a tax. And that comes from Judge Williams who asked what his underpinnings were, but the Supreme Court found that in the National Cable Association case. The next factor is what population is subject to the charge. Now, Mr. Clement would have you believe the mere fact that this is just targeted at all health insurers in the district, or all carriers, as defined by statute. Wait, could you go back to your first one? So how does that one work in this case, the first factor? So in this case, the legislature mandated that the tax be assessed. It left to the agency the mechanics for assessing that tax, but it was the legislature that required the tax to be assessed, and it's the legislature that set the population on whom that assessment would be, and that's health carriers with greater than $50,000 in profits. The legislature also set the ceiling, and that was what the exchange's budget was going to be. So the legislature, in all events, is who imposed this tax and set the boundaries for it. And could the authority now do what I was envisioning when I was having my final exchange with Mr. Clement, which is decide that now that there's a more robust participation in the exchange, that a higher proportion of this tax or fee charge should be paid by participants, and either eliminate or leave alone under the law as it's now written, could do? Yes, it is. So looking at the statute, it's subsection F1 in which the council imposes the tax, and that's on all health carriers as defined by the statute. But under subsection E1, the authority is authorized to charge user fees, licensing fees, and other assessments on health carriers selling qualified health insurance plans. So to answer your question, Judge Pillard, certainly the exchange could determine as the membership of the exchange grows and becomes more on members that are selling qualified health plans. But that's a distinct charge or user fee from the tax that's at issue in F1. But, of course, were the exchange to- But could it do that instead of the tax? Yes, it could. So let's- And doesn't that completely undermine your argument that- Not at all, Your Honor. Because you're just saying that, but isn't the consequence of what you're saying is that the authority could decide to not impose the tax and switch to a user fee? No. So the Council of the District of Columbia requires that the tax be assessed. Now, the tax can be no larger than the budget. So were the exchange to-for user fees or licensing fees that it has rulemaking authority to do, balance its budget, satisfy its budget, then the assessment mandated would be zero. But until that is the case, the Council mandates that to balance the books, the exchange must levy a tax consistent with their budget. Does the authority decide what the actual user fee for users will be? Now, the authority could. It's charged with rulemaking authority to determine the user fees or licensing fees. Is Judge Tatel right? That undermines your argument that this was decided by the legislature? No, not at all. Because there are two different subsections here. F1 is the Council's mandate that the exchange assess a tax on all health carriers. Now, distinct from that is E1, which allows the authority, through rulemaking ability, to assess things like user fees on those participating in the exchange. But there are two different sections. Supposing together the authority can eliminate the tax. Or at least reduce it to a penny, right? The authority could decide to switch to impose a user fee. You're right. The statute says it says the authority shall annually assess. Yes. And it can very well assess at zero. It can't exceed the budget, the cost of running the exchange, right? So, but it could reduce that amount to, you know, a penny and collect everything else through a user fee, right? It certainly could. It does not currently. I know, but doesn't that undermine your argument that this is determined by the legislature? The Council has authorized or mandated the authority to assess a tax to balance its books. If through other means, through fees that it's getting from the exchange, through donations, through allocation of general revenue. The question is, you saw from my question to Mr. Clement, I thought that this weighed heavily in your favor because I thought, as I read this, I thought the Council had essentially set the amount and just allowed the authority to assess. But you've now raised a problem with that by suggesting that the authority could switch to a user fee. Now, respectfully, I don't see that. The amount is the deficit between what the exchange is bringing in and what its budget is. That amount can fluctuate as more members come onto the exchange, as different fees are assessed. You know, if the federal government were to put grants into play again, they'd be taking them away. But if other monies are coming in, all that the Council has authorized the And whether that difference is $28 million or $1 million, the Council has mandated that that deficit be made up by taxes. But whether it's $28 million or $1 million depends on whether the authority decides to impose a user fee. It is subject to a variety of things, the returns on their investments, federal spending, general revenue coming in from the Council, and also, yes, user fees if they are assessed through rulemaking, to be sure. But that doesn't detract from the fact that the Council has mandated that the full budget be covered by, and any deficit be made up by, a tax on health carriers in the district. And so I think that that, on the first factor, the first factor about who imposes the charge, means that it's the legislature that's imposing the charge, and that means that it's a tax. But going on to the second factor, the question is, what population is subject to the charge? And Mr. McClint would have you believe that any charge that's not assessed from the public at large is somehow not a tax. But that's not true. We see that in all of the cases. In the Empress Casino case, what we have was the legislature in Illinois taxing riverboat casinos in order to benefit racetracks. It was a discrete population of riverboat casinos that were subject to this tax, and the Seventh Circuit, sitting on bunk, nevertheless said that was a tax, that was not a fee. Now, I think then that second factor weighs in favor of the district's position. And finally – Well, Judge Poster pretty much repudiates the three-factor test anyway. So he takes it a bit of a different task. I mean, he looks at the case law and finds that they're multi-factor tests. He doesn't think multi-factor tests are particularly important. But to the extent that he turns on any of the case law, it is these three factors. He's looking at, is the purpose revenue generation or is it offsetting costs? Here it's revenue generation. Actually, he has a long column listing strange factors that courts have relied on. Exactly. He has an entire column in the opinion that says, you know, all of these different factors are, you know, weighed one way or another. But the things that he ultimately looks at and the things that this court has looked at in the Eastern Waste case are what entity imposes the charge, what population is subject to the charge, and ultimately and critically, what purposes are served by the monies obtained. And going to that – He talks about purposes, which seem to me extremely vague. But it seems to me if you look at the way he treats particular cases, what he's really interested in is the matchup between the payors and the beneficiaries. I don't think so because the case comes out in finding that it is a legitimate tax for a riverboat casino to subsidize a race track. That's right. It's not a fee because there's actually no overlap between the beneficiaries and the payors. Right. And Mr. Clement would have you believe there's no matchup between beneficiaries here, which shows that under Amherst Casino, under Eastern Waste, and under all of the other cases that we cited in our briefs, this is a tax. The actual insurance companies that use the exchange aren't covered by this at all? No, they are. The taxes to all health care are just defined by the statute. Yeah. So, I mean, it's different from Amherst Casino in that respect. Well, respectfully, it might be different from Amherst Casino, but I don't believe it's different from Eastern Waste case because there it was the solid waste companies that were being taxed, and it was for the benefit of the public in increasing solid waste technology and recycling. But, I mean, let me give you an example here. Let's say I pay income tax. Portions of my income tax go to funding schools. That because I have a child in that school system does not suddenly convert that tax into a user fee. It is still a tax. Mere fact that I am particularly benefiting from some aspect of that tax while others might not be does not detract from the fact that it is a general assessment for the benefit of the public. However, the matchup in that case is extremely loose, right? The huge numbers of taxpayers who have no kids in the school, right? And some people who have kids in the school who are not paying any income tax. And that's precisely what you have here. You have a significant number of health insurance companies that are participating in the District of Columbia that are subject to this tax. And, yes, there are a few that are participating in the exchange that are also subject to the tax. But that does not detract from the fact that it's an assessment across the entire population which factors into it being a tax under the Valero factors. So, we think that this is a tax. Oh, Judge Pillard, did you? Just third factor. Sorry, I thought we were discussing third factor. But the purpose is served by the monies used. And here, the predominant factor, it's the revenues ultimate use. And here it's for the benefit of the district as a whole. It's to increase affordable health care in the district for all residents. And the exchange is charged with not just figuring out policies for exchange participants but for enabling all individuals to find affordable health insurance, to reduce the number of uninsured throughout the district, to educate consumers about health insurance. And so it's the public at large that's being served by this. And so in that way, we think under the Valero factor, this serves the public and is a tax. And it's like Eastern Trans Waste in that regard. Because there, the charge on solid waste companies would fund the development of methods of recycling that would benefit the entire public, not just waste manufacturers. And so there are benefits. It's a little harder here when it really is the people who are participating in the exchange who are benefiting. And, I mean, if the benefit to them benefits the society as a whole, that's a pretty attenuated version of benefit, no? No. I think the distinction is whether it's benefiting the insurers that are participating in the exchange or benefiting the members of the district residents that are getting insurance through the exchange. The public here is district residents who need affordable health care. And that's every district resident, regardless of whether or not they choose to seek that health care through the exchange or not. And that is also, we know, because the exchange's purposes are broader. Their attention is, yes, primarily concerned with the exchange, but they are charged by statute. And this is 3171-02B with enabling all individuals to find affordable health insurance and to educate consumers and all consumers, not just consumers that might participate in the health insurance market through the exchange. So we do think these are benefits that are down to the public generally, and because of that, under the third valera factor, this is a tax. Now, I'm happy to address any of the merits arguments that Mr. Clement makes if the court has any questions, but I think this is quite clear that it is a tax. Any questions? No. All right, then. Thank you. Thank you. Mr. Clement, you're out of time, but you can take two minutes. Well, Your Honor, since- Let me take up 15 of your seconds. Sure. I'll add. So going back to what we talked about right at the beginning of whether this is jurisdictional or not. Yes, it is not. And what do you do with Jenkins? D.C. courts have, quote, exclusive jurisdiction over cases involving taxes. No, I don't think it's involving taxes. I think Jenkins involved an effort to get a refund. And if you actually look at the provisions of these statutes, they are directed to petitions for review and appeals of assessments and refunds. And what's going on here, if you take a step back, is that before- Jenkins says we have exclusive jurisdiction over- I'm sorry, the D.C. courts over, quote, all challenges to D.C. taxes. All challenges. Is this a challenge to D.C. taxes? Well, no. It's a challenge to a fee, but it is also- I'm not going to make the same mistake twice. Yeah, right. But it is also, I think- Again, if you take a step back, what's going on here is before 1970, there was greater review in federal court of D.C. taxes than of any state tax. Yeah, right. And all Congress did in 1970 and in these two provisions is to restore the equity. And let me just give you another example, which is what the D.C. provision says is that the jurisdiction is exclusive to the tax subdivision of the D.C. superior courts. When the D.C. court in the ABA case, which we cite in our brief, confronted a situation where the district allowed the litigation to go forward in the civil division of the superior courts, the court decided it wasn't going to decide whether there was a stop for that or waiver for that. And so the district courts certainly don't view this as being obviously jurisdictional. And I would respect that all that's going on here is these provisions make D.C. the same as any state, which means there are certainly limits on when you're not challenging specifically a refund or an assessment. There are limits to how you can get into federal court, but those are under the Tax Injunction Act, which the courts, I think the better view of the courts is that that is not jurisdictional. So I do not think these are jurisdictional. And I don't think, and therefore I think that they have waived it. But I also think the fact that they said, they just failed to notice this. They flat out told the court that it was not a tax. Even if it's jurisdictional, that's relevant. That's relevant to the characterization of the provision. It reinforces what the legislature itself said by calling it an assessment and not a tax. It reinforces the relationship with it, with the other provisions in the code that says there will be no other taxes in lieu of this 2 percent tax on the premiums. So I think all of those factors reinforce the idea that this is not a tax. This is a fee. But if I could then just walk through very briefly the three factors. First of all, I think, I certainly agree with you, Judge Tatel, that the colloquy with the district's counsel about how the amount of the tax is ultimately going to be set vis-a-vis the user fee, in your words, completely undermines their argument on point one. The authority is the one that's going to be determining the amount of this tax based on what they do with the user fees, which is entirely in their bailiwick. But that doesn't really, I mean, you didn't make that argument and that was true before she ever raised that in terms of what's the return on their investments, in terms of how many people are, I mean, there's all kinds of other things that make the shortfall fluctuate. Sure, Judge Pillard, but I did make the argument, and I continue to think it's right, that the first factor ultimately cuts in our favor because the idea for the tax started with the authority and the legislature gave the authority essentially the right to impose the tax. Now, Judge Tatel came back to me and said, but wait, the amount's fixed essentially by the legislature. And I think this is just consistent with my idea that the real tax here, the real power over this tax is being wielded by the authority, not by the legislature. Because on the one hand, they can pump up the amount of the user fee, and in Judge Tatel's words, if they wanted to, they could reduce the amount of this assessment to a penny. But it doesn't stop there. The second factor, as Judge Williams pointed out, this is not a situation where one set over here is being taxed to pay for this thing way over here. Instead, the people who are the principal beneficiaries of this new facility that's being funded by the district are being subject to something that even the district calls a user fee when it's imposed on the users. And then it's also being imposed on some other people that the district thought were close enough to call them health carriers and impose the user fee on them. I think that puts the second factor plainly in our favor. And then on the third factor, again, here is where I think it cannot be that the test is simply whether or not the money is used to promote something that promotes the general welfare. Because I'm willing to stipulate that everything, for these purposes, that everything the district does promotes the general welfare and benefits the citizens of the district. The point is, are you using it for a specific designated purpose, or are you using it more broadly? And as Judge Breyer said for the First Circuit, a hugely important indicator is whether the money gets funneled into the general treasury, in which place it could be funneled out to anywhere and might, by happenstance, come back to a particular use. Or is it a dedicated fund that's used for a very specific thing, which is the funding of the exchanges? And there's no doubt who are the principal beneficiaries of those exchanges. Property taxes are dedicated. A portion of the property tax, I think, is dedicated to the school system, right? It may be, but typically that's just sort of a provision, but all the money goes into the general treasury. And then it goes out and is allocated as part of the appropriations process. And that doesn't happen here, and it can't happen here. And that's exactly the same as in the San Juan cellular telephone case, where the money went into the communications agency and it couldn't come out to the general treasury. And, I mean, you know, it's an odd position to be in when the other side doesn't want to say anything affirmative about the merits. I wouldn't either if I were them. I think this clearly violates a principle that goes back to Village of Norwood and is manifested in a variety of cases that can't just be dismissed as Lochner-era cases. Justice Holmes joined the two cases that we cite. He was no fan of Lochner, but he thought that Mile Salt and Railroad District No. 1 were rightly decided. This Court has cited Village of Norwood in the Colorado Springs case. The Supreme Court, both the majority in the dissent, cited it in Horn, and Justice Kagan cited it in her dissent in Coates. It's good law. Thank you, Your Honors. Thank you. Both your cases submitted.
judges: Tatel, Pillard, Williams